Georgia Republican Party v. Securities and Exchange Commission. Mr. LaCour. Thank you, Your Honors. May it please the Court, Edmund LaCour on behalf of petitioners. There is no right more basic in our democracy than the right to participate in electing our political officials. Thus, Congress has always reserved for itself the sensitive First Amendment task of regulating contributions to candidates for federal office. I'm concerned about a more fundamental point of this branch's role, which is justiciability and whether – it seemed to me to be pretty clear that there's not enough here to say that the Georgia Republican Party has standing. It's the weakest, easily, of the three, and it's the one on which venue depends. Because if – it seems to me if the Georgia Republican Party does not have standing, then it seems to me venue's improper, and we ought to either dismiss it or transfer it. So I'd like for you to address that, and you might, too, want to address if we were to transfer it where we ought to transfer it to. Yes, Your Honor. First, I would say that the Georgia Party, I believe, under this Court's precedent, has established standing. It is not the most specific of the three affidavits, but four affidavits rather. That would be a way of saying it's the least specific, right? That's correct, Your Honor. But I believe if you look at this Court's case law from 2008, the Florida NAACP case, as well as the RCA v. Florida Secretary of State case from 2014, when we're looking at prospective harms, like we're looking at here, the Court has not required organizations to necessarily name names. Moreover, the party still has alleged – Even without regard to naming names, there's just been no identification even of unnamed potential candidates or donors who have changed their behavior because of this rule when it comes to the Georgia Party. Correct, Your Honor. But I'd like to point out, though, we brought this challenge in October of 2016. This rule didn't take effect until August 20th of 2017. All the briefing was complete at that point. I think that's why this Court in RCA and in Florida NAACP has somewhat relaxed that requirement of identifying someone because at that point the rule had not even gone into effect onto any placement agent yet. Moreover, this also applies not just to covered placement agents, but to anyone who is thinking of becoming a placement agent within the next two years because of the two-year look-back. So if someone were to give $500 to the Georgia Republican Party's candidate for governor in October of 2018, that person could not work as a placement agent for money until October of 2020. So there's a large number of people covered by this potentially, but as the time – It would seem to me to be, I mean, the long pendency of it, all of those facts would suggest to me that at some point the Georgia Party could have come forward with at least a single specific example of how the rule would injure it. Perhaps, Your Honor, but that was not what was required of the challengers to government action in Florida NAACP and in the RCA case. Actually, you have the term probabilistic standing included in this court's case law there and that was enough in that instance. And here, I mean, under cases like Clapper, all we have to show is the substantial harm that we will be affected. It struck me that you're really, as Judge Pryor said, you're really relying on probability and kind of hearsay. We think there are people out there that would object to this or would be affected by it, whether they be placement agents or whether they be candidates, none of whom are before the court or who thought to bring a suit. So it's just – it seems – it does seem a stretch under the standing doctrine. Well, we also have – I'd like to point out we have direct standing because this rule applies not only to contributions to candidates, but also forbids anyone who is covered by the rule from soliciting for donations on behalf of the party. So, I mean, if you look at a case like taxation with representation from the D.C. Circuit, I mean, there the IRS changed the 501c3 status of a nonprofit. Government argued that there was no standing here. The court said, well, that's easily dismissed because clearly if there is a regulation that makes it less attractive to give to this nonprofit, that's going to harm their bottom line. Here, we have something far more severe than that. We have an actual prohibition on anyone going out and even telling their friend, hey, the Georgia Republican Party, they're doing some great things. We think you should give them some money. You cannot do that under Rule 2030 without – and that's a flat prohibition. That's not even the timeout that we're talking about here. That is a flat prohibition. Wherever the court – I mean, I think we also have direct standing for the fact that there are – whenever there is potential harm or substantial risk of harm to a party's candidates, that harms the party itself. That's the Benkiser decision from the Fifth Circuit because – Would this – would the Georgia showing suffice under the Sixth Circuit standing case that recently came out? I believe it would, Your Honor. I mean, I think that case turned on two key distinctions here. First, we were challenging merely an amendment to the MSRB's G37 rule, which had been in place for nearly 20 years. And the court said, well, looking at these affidavits, it's not clear whether it's the G37 rule from 1995 that's actually causing the potential harm here or whether it is this amendment, which is the only one actually before us, that's causing this harm. That's not the issue here, Your Honor. We have a new rule that is applying to new people in a new way. Second, that case did not involve purely prospective harm. The MSRB's rule had already been in effect by the time that case was getting briefed. And moreover, so cases like Florida NAACP and ARCIA, which might have – which had they applied in the Sixth Circuit, would not have applied to that case, whereas they do apply here. Also, to address your point, Judge Pryor, about whether venue would be proper here if the Georgia party did not have standing, I think this court could still exercise pendant venue in this instance. I mean, the case has been from the court. Pendant venue? I think – I mean, the court has been here. I mean, this case has been from the court. There's no jurisdictional problem with the New York – with this court determining the New York party or the Tennessee party's issue. I think that there's on-point case law interpreting a similar petition for review statute in the Federal Power Act context. But it seems to me that there's really a real potential for gamesmanship if we allow a party for whom there is no standing to choose a venue that would otherwise clearly be improper. And then we allow the others to travel on that after we dismiss the party for whom there's no standing. I think that could be an issue, but I don't think we're looking at that instance here. I think we had – Let's say we're concerned about that and we'd be inclined to do something about it. Correct. One thing to do would be to dismiss it entirely. Then you're out. The other is to transfer it. If we were to transfer it, where ought we to transfer it? I think, one, that sort of gamesmanship could be taken care of by motions to transfer venue, one which the SEC did not file in this instance. But if this court feels that it cannot keep the case, I think transferring would be appropriate. So, D.C. We'll send you to D.C. Venue's clearly proper there. We would be fine going to D.C. I think the Sixth Circuit would be acceptable as well. We have one of the parties headquartered there. Second Circuit would also be appropriate. I don't think there would be any problem for us in those instances because we have – I think the SEC's rule under any circuit's precedent fails both as a statutory matter and as a constitutional matter. You're not worried in D.C. that you'll have to deal with Blunt and Wagner? I think those cases are distinguishable for a couple of reasons. One, the MSRB had its own sort of evidentiary record it had put together when it put forth its rule. And whatever – whether that's adequate or not, that issue is behind us. The evidentiary record here justifying FINRA's rule is plainly inadequate. They have not identified one instance where purely within limits, fully disclosed contributions has led to quid pro quo corruption. Every instance they identify is otherwise lawful contribution plus. And there are many instances where it's only that under-the-table payment that's doing the work. And there is no lawful contribution. So it would stand to reason that it is the under-the-table payment that's actually doing the work here. Moreover, there was no statutory challenge brought in Blunt. We think that the Exchange Act does not grant this sort of power to regulate political contributions to the SEC. So – and that is a completely open issue in the D.C. Circuit. There are many good reasons why. First, Congress has always reserved that authority for themselves through FECA and through BCCRA. Congress has never deemed it appropriate for it to set contribution limits for state and local races. Those should be set by state and local elected officials who know the history and know the facts on the ground. It should not be set by a handful of lawyers sitting in D.C. who, again – and that brings us to another problem with this rule. I mean, you can tell that the SEC is outside of its depth because of how it applies. It will apply to candidates running for the same race in uneven matters in many different types of races. So whenever a covered official runs for federal office, they will be limited to accepting contributions of $350 or less, whereas their challengers can take up to $2,700. The same problem can occur at state and local races as well, though. If a covered official, for example, the mayor of a city, is running for state attorney general and he's a covered official as a mayor, he is going to face this limit that his challengers will not face. And so the Supreme Court has never countenanced a First Amendment restriction that applies unevenly to parties running for the same office, and it shouldn't here. I apologize. Can I ask one more standing question which gets to redressability? Yes. The Advisor Act rule or the SEC rule, however you want to call it, that underlays this 2030 rule, that didn't get challenged, right? It's not before the court at this time, but I don't think that creates any redressability problem. If we are to win, if this court rules for us either on statutory or First Amendment grounds, then we will have supporters who will be freed up to make contributions and to talk to their friends and ask them to make contributions. Now, whether there might be some other harm that arises from that does not go to redressability in any way. Moreover, as we've pointed out in the briefs, there's good reason to think that that harm might not actually befall investment advisors or placement agents because the SEC's rule has been in effect since 2011. The FINRA rule didn't go into effect until six years later. And during that time, the SEC was not enforcing this ban on hiring placement agents when it came to investment advisors. So it may be that they decide we need to cut placement agents out of the market altogether. I think there are plenty of good reasons why they would not do that because, as the record shows, placement agents play a vital role in this investment advisor market. But even if they were to do so, that doesn't change the fact that this court would be redressing a very real harm by ruling in favor of the parties. If there are no further questions at this time, I'll reserve the rest of my time for rebuttal. You've reserved three minutes. Mr. Berger. Good morning, and may it please the Court, Jeff Berger for the Securities and Exchange Commission. I'll be using all of the respondents' time, but to the extent the Court has any question about FINRA's motion to dismiss, maybe I can yield some time back at the end. Counsel for FINRA is sitting at the table with me. Petitioner's challenge to Rule 2030, as this Court's initial questions have suggested, has a major standing problem, and it should be dismissed for lack of standing. Before I get into the guts of standing, I do want to talk about venue because I do think… It seems to me the easy thing is to say the Georgia party doesn't have standing, right? And if it doesn't, then venue is improper. We could transfer it to the D.C. Circuit. What do you think of that? I think that's an elegant solution to the problem. It's one we talked about in response to this Court's jurisdictional question. We agree that only the Georgia party is properly before this Court, and we also agree that the Georgia party lacks standing. We recognize that courts, when there is a venue problem, can transfer to the court. That's the court where the appropriate venue to begin with. I do disagree that the Sixth or Second Circuits would be the right place to transfer the case to. The venue problem is still going to exist there. The D.C. Circuit is the one court where a joint petition could have been filed. It seems to me it's just clear that venue, if venue is proper anywhere, that's it. There would be no dispute that at least venue would be proper in the D.C. Circuit. There are messier issues. There are issues about standing both for the Tennessee party and for the New York party, right? And depending on how that got sorted out, it might then affect the venue issue as to one of those other two circuits. So if we transferred it to one of them, then it might get transferred again. I don't want that to happen. It seems to me if we're going to transfer this, it ought to be transferred once. I would agree. And then we don't have any more venue issues at least, right? I would agree. And that's why I was emphasizing the D.C. Circuit. If the D.C. Circuit determines that none of the three parties have standing, so be it. But if it determines that one of the three parties or two of the three parties have standing, there's no venue problem. Now, just to be clear, we're not conceding that there's. Right. I understand. You're not conceding that there is standing with respect to the other parties. We think there are standing problems as to all the parties. We think the Georgia party is the weakest on standing because it's. And it's the only reason we're here. It is the only reason we're here. If it's the only reason. Under the statute, there was a mention of pendant venue. Your adversary said no problem with transferring it to D.C. So if we conclude the Georgia party lacks standing, that seems to me to be the appropriate thing to do. And you seem to have no problem with that either. We don't have a problem with that. As we talked about, there's two routes, dismissal or transfer. And we understand the court could take either route. So we understand that it's a possibility. Just talk about pendant venue quickly. I mean, I'm not aware of any court that's. Can I follow up just on one? Yes, Your Honor. If we, under the venue statute, if we determine to transfer it to D.C., would we necessarily even have to make a standing decision as to Georgia? In other words, is venue just improper on its face regardless of the standing issue? I mean, the answer to the last part is yes. I think it's a tricky question that's kind of lying in the twilight of judicial opinions about which you're supposed to solve first. I mean, in theory, you should be solving standing first because it goes to the court's power, whereas venue is not a power issue. But on the other hand, part of the whole venue statute and the way Congress developed it was to give sort of the court of first filing the ability to figure this stuff out. So, unfortunately, I don't have a clear answer because I don't think the case law is real clear about which is done first. I do think there is a compelling argument as a Constitution matter that you've got to deal with standing first, but I also understand as a judicial efficiency matter that it makes some sense to deal with venue first. If I could just talk about standing in particular, there was a lot of mention of the Florida NAACP case in this notion of probabilistic standing. I do want to flag for the Court's attention. That case was a 2008 case. In 2009, the Supreme Court decided the Summers case, and I do want to quote it. This is at page 498. It says, this is expressly rejecting a statistical probability test for standing, and the Court said, the requirement of naming the affected members has never been dispensed with in light of statistical probabilities. So that part of the NAACP case is just not good law anymore. It may have been at the time, but after 2009, it's not. And the problem remains here that even under a concept of probabilistic standing, there's still not enough in the Georgia affidavit. There's nothing about numbers. There's nothing about potential vendor member firms or covered associates who could be implicated by this rule, particularly in light of the way the rule operates, which is by a timeout mechanism, a timeout on the receipt of compensation that affects the firm. The firm will then likely develop procedures that will affect covered associates. But the rule doesn't regulate political parties itself, and in that situation under Lujan, much more is needed. That's a quote from Lujan, and that much more is lacking here because the Georgia affidavit says so little. And I do think, you know, the Sixth Circuit has gone down this road before. We understand that there are some factual differences with the Sixth Circuit, but I think the takeaway that's relevant to this case from the Sixth Circuit is the Sixth Circuit just didn't understand the lack of facts that were presented, and that problem still exists here. At one point in Judge Moore's opinion, she wrote, it's just not clear why an affidavit from a injured member wasn't provided here. In the same stance here, I don't know why an injured member wouldn't provide an affidavit, and in the Georgia Declaration, there's not even a named injured member. I'm just not aware of any court that's allowed standing to proceed under an associational theory where there has not been an affidavit filed by the member, an injured member of the organization. I did also just want to talk about the theory of direct harm. You know, again, this falls into that Lujan problem of the much more that's necessary when a regulation or a statute is governing a third party not before the court and standing is substantially more difficult to find. That just doesn't exist in this case, and there's not enough provided. And I do just want to mention the way Rule 2030 operates, again, it's a timeout that's triggered by contributions, but it's contributions made to officials, not to political parties. So covered members and covered associates can give contributions to political parties and their firms will not suffer any consequence. The Commission has made this clear repeatedly, and so the idea that the direct harm will exist is just incorrect. Can I ask you the same adjustability argument I asked your opponents? I'm just interested, what's the interplay between the underlying SEC rule in 2030 and why has the SEC not enforced the underlying rule? I mean, the theory is that the Commission hasn't enforced the Advisors Act rule. I mean, that's just incorrect. I mean, there have not been many cases. We'd like to think that's because the rule is doing its job, but there have been cases. I believe there's been at least two. There's one arising from Philadelphia, and I believe both cases settled, so you're not going to find litigation about them, but that's not necessarily that uncommon. But I do think to sort of get to the first part, redressability is a big issue here. And while I don't want to talk too much about the Tennessee party because I don't think they're properly before this court and I think there's other standing problems, I just want to mention that they mention a purportedly covered associate named McManus. And in their affidavit, in the declaration, what it says is McManus has been affected both by the Advisors Act rule and by the new FINRA Rule 2030. This gets to redressability because even if this court were to get to the point of striking down Rule 2030, even by McManus' own affidavit, he'd still be affected by the Advisors Act rule, which would preclude him from making contributions to officials with the power to award investment advisory contracts. That really gets to the redressability issue, not to mention there's a further redressability issue which gets at what the Sixth Circuit decided in dismissing the case on standing, which is there's another rule called G37 that the MSRB adopted in 94. It's kind of been the model for all of these rules. There are FINRA member firms who have both municipal securities components and broker-dealer components. Some of those firms that sort of do both things have had pay-to-play controls in place for decades. You don't see enough in these declarations to know whether, for instance, if this court were to strike down Rule 2030, those other controls would still be in place as implemented by the firm. This just gets at there's a lot of redressability problems here. We haven't touched much on the merits. I do just want to mention one brief point, which is the idea that the SEC is outside of its depth is just incorrect. We're not interested in clean elections here. We're interested in clean markets, and if I can toot my agency's own horn, we are experts in clean markets. This is what we do is with markets. Congress has understood our role in this. We've been operating in this field for almost a quarter century at this point. Congress has had a chance to amend both the securities laws and the election laws, hasn't retracted that power. In fact, quite contrary, in 2010, when it extended the MSRB's power to cover municipal advisors, it expressly pointed out that the commission and the SRO's self-regulatory organizations have played a role in regulating pay-to-play. And just one last point, this gets at the idea about Blunt and Wagner. I mean, Blunt and Wagner, from a First Amendment perspective, really control this case. I mean, Blunt is affirming or upholding what is more or less the same rule, and it's doing so even under a higher level of scrutiny than it should have. And then the Wagner case comes along, and it's a unanimous en banc D.C. Circuit decision that's upholding an even less tailored rule than Rule 2030 because it's an absolute ban on all contributions by federal contractors. If your honors don't have any more questions, I'm happy to sit down. I'm happy to yield time if you have any questions for Fenner's counsel regarding their motion to dismiss. Thank you. Thank you. Mr. Farger. Just a few key points I'll address mostly standing. That's where the Court has taken most of the argument. We have not only the affidavits, we also have the administrative record that's been compiled by SEC and FINRA. Both of my friends sitting at counsel's table, both their clients have admitted that this rule very well could have its intended effect, which is to depress contributions to parties like my clients and to their candidates. I think that alone is substantial risk. If you look at a case like Davis v. FEC with the Millionaire's Amendment, Jack Davis wanted to run, and he wanted to self-finance. If the Millionaire's Amendment functioned like it was supposed to, there was a substantial risk that his opponent was going to be able to raise $6,900 from each supporter, as opposed to the $2,300 limit that would apply to Mr. Davis. Now, Mr. Davis did not have to show. He didn't have to go and depose his opponent and say, are you going to take advantage of this? He didn't have to go get affidavits from his opponent's supporters. It was enough there in a decision written by Justice Alito that this rule was going to function like it was supposed to, and that was going to harm him. That is a substantial risk under Summers, under Davis, and under more recent decisions. A firm from the other side suggested that Florida NAACP is no longer good law in this circuit. If you look at the RCA decision, that's from 2014, five years after Summers. There, the court cited favorably the NAACP case for the position that finding that large organizations like the NAACP had standing because there was a high probability that at least one of the members would be mistakenly mismatched. I mean, the facts and the law at issue in RCA are nearly a carbon copy of those at issue in the Florida NAACP case. So, Summers has not abrogated that decision in this circuit that remains good law and remains law that shows why we have established a substantial risk of harm for this prospective rule. Finally, they mentioned Wagner. Wagner involved a federal ban in FECA that was passed by Congress. The Supreme Court has said on multiple occasions that they tend to give deference to Congress and legislative judgments because legislators are the experts when it comes to running for office and balancing First Amendment interests with the need to fight corruption. The SEC, rather, and bad enough this rule was put out by the FEC, but the fact that it's been put out by the SEC, I think clearly shows that it's been, that it's ultra-biased. But the SEC says that we are the experts in clean markets. Clean markets have never been found to be a sufficient justification for limiting core political speech like that at issue in this case. And they should not be given any sort of deference like a legislature might, who, again, is most responsive to the people and has expertise in this realm. Finally, they rely on some legislative history and they rely on some congressional inaction to say that, well, clearly Congress wants us to have this power. This is the last case where you would want to rely on congressional inaction because what we're dealing with is a rule that, when applied to congressional races, is only going to affect challengers and is never going to affect incumbents. I would not expect the SEC, I would not expect senators and congressmen to really be in a hurry to get rid of this rule. But I see I've overrun my time. Thank you, Your Honor. Thank you, Mr. LaCour. We have your case and we'll move to the last one for the day.